Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 13, 2008          Decided April 22, 2008

No. 07-1190

STAR WIRELESS, LLC,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*John F. Cooney* argued the cause for petitioner. With him on the brief were *Emilio W. Cividanes* and *Ronald M. Jacobs*.

*Joseph R. Palmore*, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Matthew B. Berry*, General Counsel, Federal Communications Commission, *Daniel*

2

*M. Armstrong*, Associate General Counsel, and *Laurel R. Bergold*, Counsel.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Star Wireless, LLC ("Star"), challenges the imposition of a monetary forfeiture for violating the Federal Communications Commission's "anti-collusion rule," 47 C.F.R. § 1.2105(c).  The principal issue is whether the Commission's interpretation of its rule was not "ascertainably certain" when the relevant interactions between Star and Northeast Communications of Wisconsin ("Northeast") occurred.  Star also contends that the Commission's application of the rule was arbitrary and capricious because the harm addressed by the rule did not occur and its application thus violated Star's commercial speech rights.  We deny the petition.

**I.**

Under the Communications Act, the Commission has the authority to grant licenses through a competitive bidding process to applicants seeking to use the electromagnetic spectrum.  *See* 47 U.S.C. §§ 301, 308-09.  Among the goals of this process are "promoting economic opportunity and competition . . . . recovery for the public of a portion of the value of the public spectrum resource . . . and avoidance of unjust enrichment through the methods employed to award uses of [the electromagnetic spectrum]."  *Id.* §§ 309(j)(3)(B); (C).  The Commission's auction process for electromagnetic spectrum includes various stages.  As relevant, participants are required to fill out a "short-form" application providing preliminary information.  47 C.F.R. § 1.2105(a).  The Commission may require applicants for a license to submit an "upfront payment,"

to be applied against any payment made as part of a winning bid, *id*. § 1.2106 ("upfront payment rule"); when these payments are not made, the Commission's regulations provide that this party "will be ineligible to bid [and] its application will be dismissed," *id*. § 1.2106(c).

The Commission's anti-collusion rule is aimed, in part, at "strengthen[ing] confidence in the . . . bidding process." *In the Matter of Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, 9 FCCR 2348, 2386 (1994) ("*Anti-Collusion Rule Purposes*"). The rule prohibits:

> all applicants for licenses in any of the same geographic license areas [who are not members of a joint bidding arrangement identified on the short-form] from cooperating or collaborating with respect to, discussing with each other, or disclosing to each other in any manner the substance of their own, or each other's, or any other competing applicants' bids or bidding strategies, or discussing or negotiating settlement agreements, until after the down payment deadline.

47 C.F.R. § 1.2105(c)(1). For purposes of the anti-collusion rule, the term applicant is defined to include "all controlling interests in the entity submitting a short-form application to participate in an auction." *Id*. § 1.2105(c)(7)(i).

On March 20, 2002, the Commission issued a public notice announcing procedures to be used in "Auction 44" for licenses in the 698-746 MHZ band. *Public Notice, Auction of Licenses in the 698-746 MHZ Band Scheduled for June 19, 2002*, 17 FCCR 4935 (2002) ("*March 20 Public Notice*"). Star filed to bid for all 740 licenses to be auctioned, and appointed David G.

Behenna ("Behenna") as its authorized bidder.  Northeast filed to bid for 734 licences, and appointed Patrick D. Riordan ("Riordan") as one of its authorized bidders.  Neither Northeast nor Star listed each other as cooperating or collaborating on their short-forms.   On June 7, 2002, the Commission publicly identified applicants, including Star, that were qualified to bid. Northeast, which had not submitted an upfront payment, was not among them.  *Public Notice, Auction of Licenses for 698-746 MHZ Band*, 17 FCCR 10,700, 10,708-13, 10,732 (2002).

On August 28, 2002, Star began bidding on licenses in California and Florida.  That same day, Behenna left Riordan a voice-mail, requesting that Riordan call him back only if Northeast was not participating in the auction.  On August 29, 2002, at approximately 9:18 am, Eastern time, Riordan called Behenna, and they talked for approximately six minutes. Behenna asked if Northeast was interested in any markets, and Riordan identified four or five Wisconsin markets as being of interest.  Less than forty minutes after this conversation, Star began to bid for licenses in specific Wisconsin markets identified by Riordan, abandoning its prior bids for licenses in California and Florida.  By the end of the auction, Star was the highest bidder in three of the Wisconsin markets discussed with Northeast.

On September 6, 2002, before the end of the auction process, Star informed the Commission of Behenna's and Riordan's interactions on August 28 and 29.  By letter from its counsel, Star explained that Behenna had "mistakenly believed that the Commission's anti-collusion rules allowed communications with an entity that had filed a short-form application but was later deemed not qualified to participate in an auction."  Letter from E. Ashton Johnston, Esq. & Paul W. Jamieson, Esq., to Marlene H. Dortch, Secretary of the Commission (Sept. 6, 2002).   On August 27, 2003, the

Commission issued a Notice of Apparent Liability ("NAL") for violation of the anti-collusion rule, proposing forfeiture of $100,000.

The Commission issued Forfeiture Notices on September 22, 2004, based on its findings that Star and Northeast had "engaged in collusive conduct during a Commission-conducted auction in 2002, in willful and repeated violation of section 1.2105(c)." *In re Application of Star Wireless, LLC*, 19 FCCR 18,626, 18,626 (2004); *accord In re Application of Northeast Communications of Wisconsin, Inc*., 19 FCCR 18,635, 18,635 (2004). Finally, on May 4, 2007, the Commission affirmed its findings of willful violations in denying Star's application of review and Northeast's petition for reconsideration, but reduced the forfeitures for each company to $75,000 because neither had engaged in previous violations of Commission rules. *In the Matter of Star Wireless, LLC and Northeast Communications of Wisconsin, Inc.*, 22 FCCR 8943, 8943-44 (2007) ("*Order on Review*"). Observing that neither its rules nor the public notices for Auction 44 had conditioned the term "applicant" upon the outcome of review of the short-form applications or receipt of upfront payments, the Commission found that Northeast remained an applicant despite not having made an upfront payment. Observing further that "the plain language of the anti-collusion rule clearly states that applicants are prohibited from discussing not only their own bids and bidding strategies but also those of any other applicants that applied to bid in the same auction markets," *id*. at 8947, the Commission rejected arguments that the rule was vague, inconsistent, or unconstitutional, finding that Star and Northeast had ample notice and engaged in precisely such prohibited discussions. The Commission explained that the anti-collusion rule protected "the integrity of the Commission's auctions," that it "exist[ed] only during the time period between the short-form application filing deadline and the post-auction down payment deadline,"

and that it "protect[ed] a valid governmental interest without infringing unduly on the First Amendment rights of auction participants." *Id*. at 8951-52. In the Commission's view, Star's and Northeast's interaction "present[ed] a good example of a reason the Commission clearly prohibits certain communications under the anti-collusion rule: an applicant that is not qualified to bid in an auction nevertheless secretly influences a bidding applicant to obtain the licenses it desires." *Id*.

Star petitions for review. The court will deny a petition for review of an order by the Commission unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Commission's interpretation of its own rules is "entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Ballard v. Comm'r of Internal Revenue*, 544 U.S. 40, 70 (2005) (internal quotation omitted).

## II.

In assessing forfeitures against regulated entities, the Commission is required to provide "adequate notice of the substance of the rule." *PMD Produce Brokerage Corp. v. USDA*, 234 F.3d 48, 52 (D.C. Cir. 2000). The court must consider "whether by reviewing the regulation[] and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (internal quotations omitted).

Star contends that the Commission's interpretation of the anti-collusion rule was not "ascertainably certain" at the time of its communications with Northeast because the plain text of the rule does not specify whether Northeast remained an applicant

after failing to make the required upfront payment. At the time of the auction, Star maintains, the upfront payment rule could be reasonably interpreted as resulting in immediate dismissal of an application by an entity that did not make the required payment. Star relatedly contends that neither Auction 44 materials nor previous Commission publications sufficiently set forth the Commission's interpretation of the interaction of the anti-collusion and upfront payment rules.[1]

Even assuming Star has advanced plausible alternative interpretations of the anti-collusion rule that would make its application to Northeast uncertain, the Commission convincingly responds that the regulated community was on notice regarding the relevant scope of the anti-collusion rule. Multiple Commission documents regarding Auction 44 noted the applicability of the anti-collusion rule to "applicants for the same geographic license area," *March 20 Public Notice*, 17 FCCR at 4944; *accord Public Notice, Auction of Licenses for 698-746 MHZ Band: Status of FCC Form 175 Applications to Participate in the Auction*, 17 FCCR 9415, 9418 (May 24, 2002). Additionally, before any public announcements regarding Auction 44 were issued, Commission staff had provided guidance explicitly noting that the anti-collusion rule extended to applicants who "filed a short-form . . . . even though [they are] not [] bidder[s] in the auction." Letter to Robert Pettit, Esq., from Margaret W. Wiener, Chief, Auctions and Industry Analysis Division, of the Commission, 16 FCCR 10,080, 10,080 (WTB 2000) ("*Robert Pettit*"). The Commission listed *Robert Pettit* as one of the sources explaining the scope of

---

[1] The Commission is unpersuasive in maintaining that Star waived its right to contend that it was not given sufficient notice of the anti-collusion rule's scope. *See Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998).

the anti-collusion rule in a public notice regarding Auction 44 issued prior to the discussions at issue between Star and Northeast. *March 20 Public Notice*, 17 FCCR at 5008.

Star's attempts to obscure the clarity of *Robert Pettit*'s guidance are unavailing. Intervening changes to the anti-collusion rule after *Robert Pettit*'s issuance, *see In the Matter of Amendment of Part 1 of the Commission's Rules –- Competitive Bidding Procedures*, 16 FCCR 17,546, 17,546 (2001), were unrelated to *Robert Pettit*'s conclusion. In any event, *Robert Pettit* was cited by the Commission as authority concerning the scope of the anti-collusion rule in the *March 20 Public Notice*, a publication specifically related to Auction 44 issued after the rule-change. This constituted sufficient notice to Star that the anti-collusion rule still applied to short-form filers that did not make an upfront payment. Star's reliance on *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3, & n.4 (D.C. Cir. 1987), is also misplaced, as *Robert Pettit* was an official interpretation issued by the Commission's staff under delegated authority, which has "the same force and effect . . . [as] other actions of the Commission." 47 U.S.C. § 155(c)(3). Further, Star points to no Commission documents or any authority that contradicted *Robert Pettit*'s conclusion. The minor potential ambiguities contained in Auction 44 materials issued after March 20, 2002, were insufficient to bring into question *Robert Pettit*'s definitive interpretation of the anti-collusion rule. As presented by Star's brief, subsequent Commission pronouncements at most included reminders of the anti-collusion rule that could be interpreted as being directed only to "bidders" rather than "applicants" but, on their face, still applied to Star and could not be rationally construed as altering the Commission's prior articulation of the anti-collusion rule. We note that the Commission has clarified its instructions with regard to the anti-collusion rule, *see, e.g.*, *Auction of 700 MHZ Band Licenses Scheduled for January 24, 2008*, 22 FCCR 18,141, 18,149 (2007), but this change does not

mean that its previous warnings were not sufficient to put the regulated community on notice concerning the scope of the rule.

## III.

Star's other contentions do not require extended discussion. Challenging the Commission's application of the anti-collusion rule as arbitrary and capricious, Star contends that its communication with Northeast did not cause the harm against which the rule was directed, and consequently the rule's application penalized "constitutionally protected commercial speech." Petitioner's Br. at 28. Star also maintains that the Commission provided no explanation for treating it differently from similarly situated entities exempted from application of the anti-collusion rule. However, as the Commission observes, general bright-line prophylactic measures, such as the anti-collusion rule, are appropriate when "the probability of abuse in transactions between related organizations is significant enough that it is more efficient to prevent the opportunity for abuse from arising than it is to try to detect actual incidents of abuse." *Biloxi Reg'l Med. Ctr. v. Bowen,* 835 F.2d 345, 350 (D.C. Cir. 1987); *accord Weinberger v. Salfi*, 422 U.S. 749, 776 (1975).

Star asserts that its communications with Northeast could not have resulted in lower immediate auction prices. But Star ignores the potential for certain types of collusion to undermine Commission auctions in ways that do not immediately result in lower prices being paid. Forbidding participants in the auction process from communicating directly serves the goal of preventing such collusion, and thus "strengthen[s] confidence in the [] bidding process," *Anti-Collusion Rule Purposes*, 9 FCCR at 2386. As the Commission noted, the interactions of Star and Northeast are a "good example," *Order on Review*, 22 FCCR at 8951, of behavior that could undermine the Commission's auction processes: Star learned with certainty which markets

Northeast was focusing on, significantly narrowing the field from the initial 734 licenses in which Northeast had publicly expressed an interest. This insight gave Star an informational advantage over other auction participants; such insider dealing, especially if widespread, could reduce non-colluding parties' incentive to participate in future auctions. It is true that the anti-collusion rule includes a series of exemptions whereby entities not competing in the same market may contact each other, allowing communications that could arguably undermine the integrity of the auction process in various ways. However, an agency need not address all problems at once. *See U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001). Instead, its rules may solve first those problems it prioritizes.

Finally, Star contends that the Commission's levying of a forfeiture violated the Communication Act, which "provides that the [Commission] may impose a forfeiture only on an entity that 'willfully or repeatedly failed to comply with . . . any rule, regulation, or order issued by the Commission.'" Petitioner's Br. at 35 (quoting 47 U.S.C. § 503(b)(1)(B)). To the extent Star seeks to challenge the Commission's finding that it engaged in "repeated" violations, the Commission did not rely on the number of violations by Star in the *Order on Review*; while the 2004 Forfeiture Order against Star discussed repeated behavior, it specifically noted that "even if the behavior constituted only one violation . . . forfeiture is still appropriate," 19 FCCR at 18,632. To the extent Star seeks to challenge the Commission's interpretation of statutory text and legislative history in arriving at its definition of "willful" as meaning "consciously" rather than "with intent," Star did not preserve the issue. Neither Star nor Northeast raised this issue before the Commission, and we therefore do not address it. *See Coal. for Noncommercial Media v. FCC*, 249 F.3d 1005, 1009 (D.C. Cir. 2001) (citing 47 U.S.C. § 405); *see also Rogers Radio Commc'ns Servs., Inc. v. FCC*, 751 F.2d 408, 413 n.14 (D.C. Cir. 1985). Although the O*rder*

*on Review* relied on a definition of "willful," this does not mean that the Commission would have necessarily understood that its pre-existing definition was being challenged. *See Time Warner Entm't Co.*, 144 F.3d at 81. Insofar as Star would claim the definition of "willful" was mistaken, it should have provided the Commission an opportunity to re-examine its definition rather than now inviting this court to engage in a "freewheeling policy inquiry," *Verizon Tel. Cos. v. FCC*, 292 F.3d 903, 910 (D.C. Cir. 2002). Star's position that it would have been futile to challenge the Commission's definition "[g]iven the [Commission's] 40-year history of applying the same interpretation," Petitioner's Reply Br. at 18, is unconvincing because Star points to nothing concrete to support its claim of futility, *see Action for Children's Television v. FCC*, 564 F.2d 458, 469 (D.C. Cir. 1977), such as a plain desire by the Commission to "rapidly expedit[e]" a review process, *Omnipoint Corp. v. FCC*, 78 F.3d 620, 635 (D.C. Cir. 1996). *See also Chadmoore Commc'ns, Inc. v. FCC*, 113 F.3d 235, 239-40 (D.C. Cir. 1997).

Accordingly, we deny the petition for review.