# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 7, 2010            Decided August 6, 2010

No. 09-5360

HOWMET CORPORATION,
APPELLANT

v.

ENVIRONMENTAL PROTECTION AGENCY AND LISA PEREZ
JACKSON, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01306-EGS)

———

*Bryan J. Moore* argued the cause and filed the briefs for appellant.

*Donald J. Patterson, Jr.* and *Bethany S. French* were on the brief for *amicus curiae* Alliance of Automobile Manufacturers in support of appellant.

*Justin R. Pidot*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Robert H. Oakley*, Attorney.

Before: SENTELLE, *Chief Judge*, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

BROWN, *Circuit Judge*: The Environmental Protection Agency (EPA or the Agency) says Howmet Corporation (Howmet) violated the Resource Conservation and Recovery Act and the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 *et seq.* (collectively RCRA), and its implementing regulations. Howmet says its actions were permitted by the regulations. Whether viewed as a syntactical ambiguity or a semantic squabble, the dispute focuses on one question: when is a material no longer serving "the purpose for which it was produced?" The EPA insists the initial use of the material is determinative; Howmet contends the initial use is irrelevant. The question matters because "spent material" is subject to RCRA's hazardous waste regulations, but material that has not been spent is not. Howmet insisted that used KOH (liquid potassium hydroxide) sent to a fertilizer manufacturer for use as a fertilizer ingredient was not "spent material" and thus not subject to RCRA regulations. After Howmet lost this argument before an administrative law judge (ALJ) and the Environmental Appeals Board (EAB), the district court rejected Howmet's Administrative Procedure Act claim and granted the EPA's cross-motion for summary judgment, holding the EPA's interpretation of its "spent material" regulation was not arbitrary and capricious and that Howmet had fair notice of the Agency's interpretation. *See*

*Howmet Corp. v. EPA*, 656 F. Supp. 2d 167 (D.D.C. 2009). We affirm.

I

Subtitle C of RCRA, 42 U.S.C. §§ 6921–34, establishes a "stringent 'cradle-to-grave' regulatory structure for overseeing the safe treatment, storage and disposal of hazardous waste." *Sierra Club v. EPA*, 292 F.3d 895, 896 (D.C. Cir. 2001). The statute defines "hazardous waste" as a "solid waste [that] may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5). The EPA has broad investigatory and enforcement authority under RCRA. *See Gen. Motors Corp. v. EPA*, 363 F.3d 442, 444 (D.C. Cir. 2004). Pursuant to this authority, the EPA has imposed numerous requirements and restrictions on the generators and transporters of hazardous waste, including requiring EPA identification numbers, 40 C.F.R. § 262.12(c), the use of hazardous waste manifests identifying contaminants, *id.* § 262.20(a), and written notification of land disposal restrictions, *id.* § 268.7(a).

Hazardous wastes are a subset of solid wastes. *See* 42 U.S.C. § 6903(5); 40 C.F.R. § 261.3(a). Since a substance cannot be a "hazardous waste" or subject to the EPA's hazardous waste regulations unless it satisfies the threshold definition of "solid waste," our analysis begins with the definition of solid waste. "Solid waste" is "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." 42 U.S.C. § 6903(27). Discarded material includes recycled materials (materials that have been "used, reused, or reclaimed," 40 C.F.R. § 261.1(c)(7)) and spent materials (any material so

contaminated by use it can no longer serve "the purpose for which it was produced without processing," *id.* § 261.1(c)(1)). Under the EPA's regulations, when a spent material is recycled, it must be managed as a solid waste. Moreover, if the material also exhibits a hazardous characteristic, such as corrosivity,[1] *see id.* §§ 261.3(a), 261.20–.24, it must be managed as a hazardous waste subject to the RCRA requirements. Thus, as the EAB noted, when a hazardous "spent material" is recycled, or "[u]sed to produce products that are applied to or placed on the land or are otherwise contained in products that are applied to or placed on the land," *id.* § 261.2(c)(1)(i)(B), it must be managed as hazardous waste. The resolution of this appeal rests on whether the materials in question were "spent" and should be deemed solid waste. Since "spent material" is material that has been used and as a result of contamination can no longer serve "the purpose for which it was produced without processing," the central issue in this case is the interpretation of the phrase "the purpose for which it was produced."

The EAB's syllabus succinctly summarizes the dueling interpretations: "Howmet argues that 'purpose' implies a fundamental purpose. Howmet's interpretation would allow a multi-use product, such as KOH, to be used first as a cleaning agent and then as a fertilizer ingredient without being 'spent,' because both uses allegedly are consistent with KOH's broad fundamental purpose as a concentrated source of hydroxide ions and of potassium. [The Agency argues] that a product's purpose for production (*i.e.*, 'the purpose for which it was produced') must be related to its original use, [so] a product first used as a cleaning agent becomes a 'spent material' when

---

[1] Corrosivity is deemed present if the waste is aqueous and has a pH of less than or equal to 2 or greater than or equal to 12.5. *See* 40 C.F.R. § 261.22(a).

it becomes too contaminated for that use and then is sent to a fertilizer manufacturer to be used in a fundamentally different manner."

## II

The facts in this case are not in dispute. Howmet manufactures precision investment castings for aerospace and industrial gas turbine applications. To clean the ceramic core from the metal castings, Howmet uses an aqueous KOH solution. During the cleaning process the KOH is contaminated. Howmet uses the KOH solution until it becomes so contaminated it can no longer effectively clean the castings. The used KOH is corrosive. Thus, under the EPA's regulations, the used KOH would be regulated as hazardous waste. *See* 40 C.F.R. § 261.22.

Typically, Howmet accumulates the used KOH in storage tanks at an authorized hazardous waste disposal facility. However, between August 1999 and September 2000, Howmet sent some of the used KOH to Royster, an independent fertilizer manufacturing company that, without processing or otherwise reclaiming it, added the KOH to its fertilizer to control pH and provide a source of potassium. Howmet did not prepare any hazardous waste manifest for the shipments to Royster or otherwise treat the KOH as a hazardous waste under RCRA, 42 U.S.C. §§ 6901–91.

In 2003, the EPA brought enforcement actions against Howmet, alleging the used KOH sent to Royster was a solid and characteristic hazardous waste, in that it was corrosive and potentially contaminated with chromium, and therefore subject to RCRA jurisdiction. The EPA alleged Howmet violated RCRA and its implementing regulations by (1) shipping hazardous waste to facilities that did not have an

EPA identification number; (2) sending hazardous waste offsite using transporters without EPA identification numbers; (3) failing to prepare hazardous waste manifests for the KOH shipments to Royster; and (4) failing to send and maintain on file appropriate land disposal restriction notifications for the KOH shipments informing Royster whether the KOH was too contaminated for land application without prior treatment.

Howmet contested the allegations and requested a hearing. An ALJ found Howmet liable under RCRA, concluding the used KOH sent to Royster was a hazardous "spent material" and therefore a solid waste that must be managed as a hazardous waste and that Howmet had failed to manage the KOH in accordance with EPA regulations. The ALJ also concluded Howmet had not proved it was denied due process because it had not received fair notice of the EPA's interpretation of its spent material regulation. The ALJ assessed a civil fine of $309,091 against Howmet. Howmet appealed to the EAB, which upheld the ALJ's finding in a lengthy decision detailing RCRA's statutory and regulatory framework. Howmet filed a complaint in the district court claiming the EAB's decision was arbitrary and capricious, but the district court awarded summary judgment in favor of the EPA, holding the EPA reasonably interpreted its "spent material" regulation and that Howmet had fair notice of the EPA's interpretation. *Howmet Corp.*, 656 F. Supp. 2d 167. This appeal followed.

III

We review the district court's grant of summary judgment de novo, *see Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008), and must set aside the EPA's final determination if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). We accord an

agency's interpretation of its own regulations a "high level of deference," accepting it "unless it is plainly wrong." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1327 (D.C. Cir. 1995); *see also Exportal Ltda. v. United States*, 902 F.2d 45, 50 (D.C. Cir. 1990) ("It is well established that a reviewing court owes deference to an agency's construction of its own regulations."). Under this standard, we must defer to the EPA's interpretation as long as it is "logically consistent with the language of the regulation[s] and . . . serves a permissible regulatory function*." Gen. Elec.*, 53 F.3d at 1327. *But see Exportal*, 902 F.2d at 50 (explaining deference is due "*only* when the plain meaning of the rule itself is doubtful or ambiguous" and thus deference to an agency's interpretation "is not in order if the rule's meaning is clear on its face"). Moreover, "[t]he policy favoring deference is particularly important where . . . a technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations." *Gen. Elec.*, 53 F.3d at 1327 (noting that "[i]n such circumstances, 'the arguments for deference to administrative expertise are at their strongest'").

## A. *The definition of "spent material" is ambiguous*

Both parties seem to agree our analysis should begin with determining whether the regulatory text of the EPA's spent material definition, as applied to Howmet's KOH shipments to Royster, is clear on its face. Howmet argues the EPA's definition is unambiguous. It claims both the dictionary definition of "purpose" ("the object . . . for which something exists"), as well as the context of the regulation, are relevant and support its position. Howmet insists the plain language of the definition—"the purpose for which it was produc*ed*"— looks retrospectively to a material's intended purpose at the time it was produced, not prospectively to the first use made of the material following its production and therefore does not

permit the interpretation adopted by the EPA. The EPA, on the other hand, argues the word "purpose" is ambiguous, both taken alone and in context, and that the phrase "the purpose for which it was produced" could relate to a material's use, especially where, as here, the producer of the material does not itself put the material to use, but rather creates the product for sale. We agree with the EPA.

Neither the word "purpose" nor the phrase "the purpose for which it was produced" are defined in the EPA's regulations, and the dictionary definition relied on by Howmet provides little help in determining the meaning of either the word or phrase, as they are used in 40 C.F.R. § 261.1. The everyday meanings of the term and phrase also do not provide any clarity as to whether the initial use of a material is relevant to determining the purpose for which the material was produced. In sum, the text of the EPA's definition is simply ambiguous with respect to whether we should adopt Howmet's "multiple, original purposes" approach to determining when a material is "spent," or whether we should, instead, adopt the "original use"-based purpose test advanced by the EPA.

B. *The EPA's interpretation of the "spent material" regulation is reasonable*

Having concluded the plain language of the EPA's "spent material" definition does not answer the question whether the used KOH sent to Royster was a spent material, we examine whether the EPA's interpretation of the definition is reasonable. *See, e.g.*, *Gorman v. NTSB*, 558 F.3d 580, 589 (D.C. Cir. 2009) (explaining this court must uphold an agency's interpretation of an ambiguous regulation if reasonable); *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1037 (D.C. Cir. 2008). In so doing, we look to the

EPA's overall regulatory framework under RCRA, as well as the regulatory history of the Agency's "spent material" definition. Both establish the EPA's interpretation is reasonable and consistent with the Agency's prior interpretations.

1. *Regulatory History of the EPA's "Spent Material" Definition*

The EPA's current hazardous waste regulations were promulgated in 1985 primarily to clarify "which materials are solid and hazardous wastes when they are recycled." Hazardous Waste Mgmt. Sys.; Definition of Solid Waste, 50 Fed. Reg. 614, 614 (Jan. 4, 1985) (to be codified at 40 C.F.R. pts. 260, 261, 264, 265, 266). The EPA's original 1980 regulations implementing Subtitle C of RCRA did not include a reference to "spent material" or a material's "purpose." Hazardous Waste Mgmt. Sys.: Identification and Listing of Hazardous Waste, 45 Fed. Reg. 33,084 (May 19, 1980) (to be codified at 40 C.F.R. pt. 261). Instead, a material was considered "solid waste" when, among other things, it had been "used" and "sometimes discarded." *See id.* at 33,093, 33,119. Under the regulations, a material that "ha[d] served its *original intended use* and sometimes [wa]s discarded" was a "solid waste." 40 C.F.R. § 261.2(b)(2) (1980) (emphasis added); *see also* 45 Fed. Reg. at 33,119.[2] Thus, once a material had been used and could no longer serve its originally intended use, it was considered waste. Notably, the preamble to the final 1980 regulations used the phrase "original intended *purpose*" rather than "original intended *use*" to

---

[2] A material was "discarded" if, among other things, it was "placed into or on any land" without being "re-used, reclaimed or recycled." 40 C.F.R. § 261.2(c), (d) (1980); *see also* 45 Fed. Reg. at 33,119.

describe "solid waste." 45 Fed. Reg. at 33,093, 33,099 (emphasis added). The preamble, while not binding, *see Kennecott Utah Copper Corp. v. U.S. Dep't of the Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996) (explaining "whether [a] preamble has independent legal effect . . . is a function of the agency's intention to bind either itself or regulated parties); *see also Nat'l Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009), is informative with respect to how the EPA intended to determine a material's "purpose." The fact the EPA substituted the term "use" for "purpose" in the final regulation is consistent with the EPA's current position that a used material's original "purpose" should be determined by looking to how the material was initially deployed after being purchased as a product—*i.e.*, the material's "original intended use."

In 1983, the EPA proposed the rule containing the current hazardous waste regulations. *See* Hazardous Waste Mgmt. Sys., 48 Fed. Reg. 14,472 (proposed Apr. 4, 1983) (to be codified at 40 C.F.R. pts. 260, 261, 264, 265, 266). The Agency proposed several important changes to the definition of "solid waste." Most importantly, the EPA's proposed definition would no longer base a material's status as solid waste on whether it was "sometimes discarded." *See id.* at 14,475. Instead, a recycled material's regulatory status would depend "upon both what the material [was] and how it [was] actually managed." *Id.* The revised definition of "solid waste" stated that five types of recycling activities, including "[u]se constituting disposal . . . which involves the direct placement of wastes onto the land," would be within the EPA's jurisdiction. *Id.* at 14,476. The five categories were further divided according to the type of waste involved. One such type of waste was "spent material," which the EPA described in the preamble as "materials that have been used and are *no longer fit for use* without being regenerated,

reclaimed, or otherwise re-processed." *Id.* (emphasis added). The EPA explained that "processes using spent materials may be more logical candidates for regulation because spent materials (having already fulfilled their *original use*) are more inherently waste-like." *Id.* at 14,488 (emphasis added). The proposed regulation itself defined "spent material" as "any material that has been used and has served its *original purpose*." *Id.* at 14,508 (proposed 40 C.F.R. § 261.2(b)(1)) (emphasis added). Again, the EPA's synonymous use of the singular term "original use" and the term "original purpose" reveals the Agency viewed the two concepts as closely connected and interrelated.

The EPA finalized the proposed regulations in 1985. *See* Hazardous Waste Mgmt. Sys.; Definition of Solid Waste, 50 Fed. Reg. 614 (Jan. 4, 1985). Although the EPA stated it "was continuing to define spent materials as those which have been used and are no longer fit for use without being regenerated, reclaimed, or otherwise reprocessed," *id.* at 624, the EPA acknowledged its "reference to original purpose [in the 1983 proposed regulations] was ambiguous when applied to situations where a material can be used further without being reclaimed, but the further use is not identical to the initial use." *Id.* The Agency therefore stated it was "clarifying what [it] mean[t] by spent materials," *id.*, and, accordingly, revised the wording of the definition to read as it does today: "A 'spent material' is any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing," 40 C.F.R. § 261.1(c)(1) (1985). In the preamble, the EPA provided an example of a product used for a subsequent purpose not identical to its original use that would *not* be considered a spent material:

> [W]here solvents used to clean circuit boards are no[] longer pure enough for that continued use, but are still pure enough for use as metal degreasers. These solvents are not spent materials when used for metal degreasing. The practice is simply continued use of a solvent (This is analogous to using/reusing a secondary material as an effective substitute for commercial products.). The reworded regulation clarifies this by stating that spent materials are those that have been used, and as a result of that use become contaminated by physical or chemical impurities, and can no longer serve the purpose for which they were produced.

50 Fed. Reg. at 624.

As noted above, we recognize an agency's preamble guidance generally does not have the binding force of the agency's regulations. Nonetheless, it is at least informative. The example the EPA provided is illustrative of the type of subsequent use of a material it sought to regulate under RCRA. The example suggested certain "continued use[s]" of a material sufficiently similar to or consistent with the material's *initial* use would be considered "a purpose for which [the material] was produced" and thus permitted under the Agency's "spent material" definition. Thus, the example makes clear the EPA was, in both 1983 and 1985, associating the concept of "purpose" with "initial use." The EPA's accompanying explanation further indicates the Agency intended to place limits on the types of reuse allowable under its regulations. The Agency's acknowledgement that its spent material definition was ambiguous when applied to situations where a material's "further use *is not identical* to [its] initial use" implies the Agency intended to create a distinction

between certain types of reuse.[3] In fact, had the EPA intended, as Howmet insists, to allow *any* reuse that is a "normal use" of a material, its clarification of situations where "the further use is not identical to the initial use" would have been superfluous.

## 2. *RCRA's overall purpose*

In addition to being inconsistent with the regulatory history of the EPA's "spent material" definition, we find Howmet's position to be incompatible with the overall thrust of RCRA and its implementing regulations. Congress described the national policy objective of RCRA as, wherever feasible, reducing or eliminating "the generation of hazardous waste." 42 U.S.C. § 6902(b). "Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." *Id.* Congress recognized that "disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to

---

[3] Amicus Curiae in support of Howmet, Alliance of Automobile Manufacturers, argues that, under the EAB's decision in *In Re: Gen. Motors Auto.-N. Am.*, No. RCRA 05-2004-0001, Appeal No. RCRA (3008) 06-02 (EAB June 20, 2008), handed down a year after the EAB's decision in *Howmet*, a material is not "spent" if subsequently used for a "legitimate purpose," even if that use is different "in some sense" from how it was used in its initial deployment. Amicus Br. at 5–7. However, Amicus' argument ignores a key part of the EAB's holding in *General Motors*. In *General Motors*, the EAB clarified its "continued use" policy by holding a subsequent use must satisfy two primary conditions in order to be considered "a purpose for which [the material] was produced." *In re: Gen. Motors*, slip op. at 2. The first condition is that the continued use "must be similar to or consistent with the initial deployment or application of the material." *Id.*

human health and the environment." *Id.* § 6901(b)(2). Moreover, Congress acknowledged that materials being reused and recycled "can indeed be solid and hazardous wastes and that these various recycling activities may constitute hazardous waste treatment, storage, or disposal." H.R. REP. NO. 98-198(I), at 46 (1983), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5605. Congress thus conceded that certain recycled materials must be regulated in order to further its overall goal of "protect[ing] human health and the environment." *Id.*

Consistent with Congress's guidance, the EPA's regulations recognize that recyclable materials, if not managed properly, may present significant risks to public health and the environment. Congress and the EPA have also indicated their concerns are heightened when materials and applications applied to the land are involved. *See* 48 Fed. Reg. at 14,474 (explaining that "wastes destined for recycling can present the same potential for harm as wastes destined for treatment and disposal," that "using or reusing wastes by placing them directly on the land . . . may present the same sorts of hazards as actually incinerating or disposing of them," and noting "[f]acilities that recycle hazardous wastes have caused serious health and environmental problems by directly placing the wastes on the land" and that "[i]mproper storage, overaccumulation of inventory, and unsafe transport before recycling have also been recurring problems").

Under the EPA's regulations, certain recycled materials are not treated as solid wastes when "[u]sed or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed" or "[u]sed or reused as effective substitutes for commercial products." 40 C.F.R. § 261.2(e)(1)(i), (ii). However, "[m]aterials used in a manner constituting disposal, or used to produce products that

are applied to the land," *id.* § 261.2(e)(2)(i), are treated as solid wastes, regardless, "even if the recycling involves use, reuse, or return to the original process," *id.* § 261.2(e)(2). Accordingly, when a material has become contaminated, and a party seeks to use the contaminated material for a purpose substantially different from its original use by applying it to the land, the party seeking to reuse the material has an obligation to examine the material, disclose its hazardous characteristics, and treat it as a hazardous waste. Fertilizer is indisputably a product "applied to the land." Thus, the shipment of a corrosive material such as used KOH to be used to produce fertilizer appears to be the type of activity the EPA sought to regulate under RCRA.

Having determined the Agency's interpretation is reasonable, we need not evaluate the reasonableness of Howmet's proposed interpretation. Once it is established that an agency has adopted a reasonable interpretation of an ambiguous regulation, the agency's interpretation stands even if a regulated entity has proposed an interpretation that might comport with the statutory scheme equally well or even better.

IV

We turn briefly to Howmet's alternative argument that, even if we conclude the EPA's interpretation of its "spent material" regulation was reasonable, we should nonetheless reverse the district court because Howmet was not given fair notice of the EPA's interpretation. Howmet's second argument fares no better than its first.

"Traditional concepts of due process incorporated into administrative law preclude an agency from penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broad.*

*Co., Inc. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987). In determining whether a party was provided fair notice, we ask first "whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations." *Gen. Elec.*, 53 F.3d at 1329. "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Id.* This court has held published agency guidance may provide fair notice of an agency's interpretation of its own regulations. *See Star Wireless, LLC v. FCC*, 522 F.3d 469, 474 (D.C. Cir. 2008).

One year after the EPA promulgated its 1985 final rule defining "spent material," 40 C.F.R. § 261.1(c)(1), it published a guidance manual describing the interpretation it adopted with respect to Howmet's KOH shipments. *See* OFFICE OF SOLID WASTE, U.S. EPA, GUIDANCE MANUAL ON THE RCRA REGULATION OF RECYCLED HAZARDOUS WASTES (1986) (*Guidance Manual*). The 1986 *Guidance Manual* states:

> [A] spent material is any material that has been used and as a result of contamination can no longer serve the *purpose for which it was produced* without processing. EPA interprets "the purpose for which a material was produced" to include all uses of the product that are similar to the original use of the particular batch of material in question. For example, EPA cites the case of materials used as solvents to clean printed circuit boards . . . . If the solvents become too contaminated for this use but are still pure enough for similar applications (e.g., use as metal

degreasers), they are not spent materials. Use of slightly contaminated solvents in this way is simply continued use of the original material rather than recycling of a spent material. However, the solvents would be spent materials if they had to be reclaimed before reuse or if the manner in which they were used was not similar to their original application. . . . As [an] example, used plating baths reused directly in other plating processes would not be spent materials. If used for a purpose other than plating, however, the used plating baths would be a spent material.

*Id.* at 1–7. The EPA announced the availability of the *Guidance Manual* in the *Federal Register. See* 51 Fed. Reg. 26,892, 26,892 (July 28, 1986) (noting the guidance document is "designed to assist . . . the regulated community in applying the definition of solid waste . . . to determine which materials when recycled are solid and hazardous wastes"); *see also Perales v. Reno*, 48 F.3d 1305, 1316 (2d Cir. 1995) ("Due process cases have long recognized that publication in the Federal Register constitutes an adequate means of informing the public of agency action.").

The EPA's explanation of the definition of spent material in the *Guidance Manual* should have put Howmet on notice of the EPA's interpretation of its "spent material" definition, and Howmet should have been able to determine that, based on the EPA's interpretation, the used KOH it transferred to Royster was a spent material. Use as a fertilizer ingredient is not a use "similar to" use as an industrial cleaning agent. Thus, even assuming the EPA's 1985 Final Rule and its accompanying regulations lacked enough clarity, on their own, to provide Howmet fair notice of the EPA's interpretation of its spent material definition, the *Guidance Manual*, made available to Howmet one year after the regulation was promulgated and

thirteen years before the conduct at issue here, was sufficient to do so.

## V

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

KAVANAUGH, *Circuit Judge*, dissenting:

The Resource Conservation and Recovery Act of 1976 grants EPA authority to regulate the generation, storage, transport, treatment, and disposal of "hazardous waste." As relevant here, the statute provides that hazardous waste must be "discarded material." 42 U.S.C. § 6903(5), (27). In 1985, EPA issued regulations that construe "discarded material" to include certain "spent material." *See* 40 C.F.R. § 261.2. A material is "spent" if it is no longer suitable for "the purpose for which it was produced." *Id.* § 261.1(c)(1). A separate regulation makes clear that "purpose," though singular, can include multiple purposes. *See id.* § 260.3(b).

The key issue in this EPA enforcement action concerns the 1985 regulations' phrase "purpose[s] for which [a material] was produced." The material at issue here – liquid potassium hydroxide – is produced and marketed for, among other things, use in fertilizer. Yet EPA seeks to impose fines on Howmet for shipping liquid potassium hydroxide for use in fertilizer simply because Howmet had already used the potassium hydroxide as a metal cleaning agent. In justifying its enforcement action, EPA claims that the "purpose for which [a material] was produced" includes only the material's *first use* by the purchaser.

In my judgment, EPA's argument mangles the language of the 1985 regulations. As a matter of plain English, the purposes for which a material is produced are not limited to how the material is initially used by a purchaser. As Howmet cogently argues, "the first use that is made of a material after the material is produced simply cannot define or change the purpose for which the material was previously produced." Howmet Reply Br. at 5. To be sure, EPA would prevail here if the 1985 regulation said that "spent material" is material that is re-used. But the regulation does not say anything like that. EPA's current interpretation of the 1985 regulations in

effect deletes the word "produced" and substitutes the words "first used." EPA's current interpretation is flatly inconsistent with the text of its 1985 regulations. To me, this case begins and ends with that rather simple point.

Courts must not "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris County*, 529 U.S. 576, 588 (2000). That's what EPA is attempting to do here. EPA is seeking to expand the definition of spent material – and thereby enlarge its regulatory authority. It may be that broader EPA regulatory authority in this area would be wise as a policy matter. But EPA may not obtain that authority by distorting the terms of the 1985 regulations.

What's more, EPA's current interpretation contravenes EPA's explicit statement in the preamble to the 1985 regulations – namely, that it was not extending its regulatory authority to "situations where a material can be used further without being reclaimed, but the further use is not identical to the initial use." *Hazardous Waste Management System; Definition of Solid Waste*, 50 Fed. Reg. 614, 624 (Jan. 4, 1985). EPA now wants to read the 1985 regulations to allow it to regulate precisely what the preamble said it could not regulate.

Of course, there is good reason the 1985 regulations did not go as far as EPA now wants to. Doing so would violate the text of RCRA, the governing statute, which as relevant here confines EPA's authority to regulation of "discarded material." We have held that Congress intended the term "discarded material" to carry its "ordinary, plain-English meaning" – namely, to cover only material that is "disposed of, thrown away, or abandoned." *American Mining Cong. v. EPA*, 824 F.2d 1177, 1184-85, 1190 (D.C. Cir. 1987); *see*

*also Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1051 (D.C. Cir. 2000). EPA's current extension of its RCRA jurisdiction to reach materials that, far from being disposed of, abandoned, or thrown away, are being used as anticipated disregards Congress's decision to restrict EPA's authority to regulation of "discarded material." In our Court, Howmet has raised a challenge based only on the 1985 regulations, not on RCRA, so there is no basis here for further exploring the statutory boundaries. But in light of today's decision, we may have to consider in a future case whether EPA's expansion of its regulatory authority transgresses RCRA's limits.

\* \* \*

I would reject EPA's interpretation of its 1985 regulations as contrary to the clear language of the regulations. Even assuming the regulations are susceptible to a range of reasonable readings, EPA's interpretation is outside that range. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). I respectfully dissent.