# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 8, 2015          Decided July 17, 2015

No. 14-1131

ADX COMMUNICATIONS OF PENSACOLA AND ADX
COMMUNICATIONS OF ESCAMBIA,
APPELLANTS

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

6 JOHNSON ROAD LICENSES, INC., ET AL.,
INTERVENORS

---

On Appeal of an Order of the
Federal Communications Commission

---

*Dan J. Alpert* argued the cause and filed the briefs for appellants.

*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Jonathan B. Sallet*, General Counsel, *David M. Gossett*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Pamela L. Smith*, Counsel, and *Jacob M. Lewis*, Associate General Counsel, entered appearances.

*David D. Oxenford*, *Lawrence M. Miller*, *Lewis J. Paper*, and *Victoria N. Lynch* were on the joint brief for intervenors.

Before: ROGERS, TATEL and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  ADX Communications ("ADX") unsuccessfully petitioned the Federal Communications Commission to deny the assignment to a competitor of several radio licenses in the Pensacola, Florida, and Mobile, Alabama, markets.  On appeal, ADX contends that, in applying the statutory caps on ownership of radio stations, the Commission should not have used its normal market definition methodology because of unique aspects of the Pensacola and Mobile markets. Alternatively, it contends the Commission should have applied the two-year waiting period applicable to changes in market definition.  Consistent with our deferential standard of review, because the Commission reasonably exercised its judgment in deciding not to deviate from the market definition methodology it adopted in 2003, and because its interpretation of the waiting period was consistent with the policy established in its prior order and not otherwise suspect, we affirm.

**I.**

The Communications Act, 47 U.S.C. §§ 151 *et seq.*, charges the Federal Communications Commission with regulating radio stations, *see id.* § 303, primarily through licensing, *see id.* § 307. In awarding new licenses or approving transfers of licenses, the Commission must determine whether the proposed ownership of the license would serve the "public interest, convenience, and necessity." *See id.* §§ 309(a), 310(d).  Guided by the principle that the public interest is served by the "diversification of mass media ownership," which "prevent[s] undue concentration of

economic power," *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 780 (1978), the Commission has long capped the number of radio stations that one entity can own in a radio market. *See generally In the Matter of 2002 Biennial Regulatory Review*, 18 FCC Rcd. 13620, ¶ 235 (2003) ("*Ownership Order*"). The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), set specific ownership caps, based on the total number of radio stations in a market, *see id.* § 202(b)(1)(A)-(D), 110 Stat. 110, which the Commission adopted in its radio ownership rules.[1] The Commission has reviewed the ownership rules several times since 1996, *see id.* § 202(h), and concluded the numerical limits continue to serve the public interest. *See generally Prometheus Radio Project v. FCC*, 652 F.3d 431, 462–63 (3d Cir. 2011).

Before 2003, the Commission used a "contour-overlap methodology" for identifying the boundaries of a radio market. *See Ownership Order*, ¶ 256. A radio station's "market" was determined based on the overlaps between its "principal community contours" — the area in which the station's signal is strong — and other stations' principal community contours. *See id.* ¶¶ 250–52. The Commission treated as commonly owned all stations whose principal community contours mutually overlapped with each other, *see id.* ¶ 251, and the

---

[1] The ownership caps are: (1) in a market with fourteen or fewer radio stations, no owner can hold more than five total licenses and three same-service (*i.e.*, AM or FM) licenses, (2) in a market with between fifteen and twenty-nine radio stations, no owner can hold more than six total licenses and four same-service licenses, (3) in a market with between thirty and forty-four radio stations, no owner can hold more than seven total licenses and four same-service licenses, and (4) in a market with forty-five or more radio stations, no owner can hold more than eight total licenses and five same-service licenses. 47 C.F.R. § 73.3555(a).

market as all stations whose principal community contours overlapped with any one of the commonly owned stations' principal community contours, *see id.* ¶ 252. This meant that the definition of the "market" changed for each combination of stations. *Id.* ¶ 256.

By 2003, the Commission had identified "conceptual problems" with the contour-overlap methodology, *id.* ¶ 257: Sometimes a station was "counted in the market for purposes of establishing the number of stations in the market," but was not "counted against a licensee's cap on the number of stations it may own in that market." *In the Matter of 1998 Biennial Regulatory Review*, 15 FCC Rcd. 11058, ¶ 66 (2000); *see also Ownership Order* ¶¶ 253–55. Sometimes the contour-overlap methodology created inconsistent market definitions where "the size of a radio market" was "unique to the proposed combination being evaluated," rather than being "in line with coherent and accepted methods for delineating geographic markets for purposes of competition analysis." *Id.* ¶ 256. The methodology created perverse incentives to consolidate ownership, *id.* ¶ 257, and it often did not meaningfully capture the actual state of competition in a given area, *id.* ¶¶ 258–59.

To remedy these shortcomings, the Commission adopted the market definitions produced by Arbitron, a private company that collects data on the telecommunications market. (Arbitron was acquired and renamed Nielsen Audio in 2013, *see* Appellee's Br. 8 n.6; for clarity, we refer to Arbitron.) The Commission found "Arbitron's market definitions are an industry standard and represent a reasonable geographic market delineation within which radio stations compete." *Id.* ¶ 276. For major metropolitan areas, Arbitron defines an "Arbitron Metro Survey Area" (or simply "Arbitron Metro"), which represents the "commercially accepted and recognized definition of [the] radio market." *Id.* ¶¶ 274–75. Arbitron also identifies

each station's "home" Metro, based either on the community that the station is licensed to serve (or "community of license") being within the Metro, or on its determination that a station licensed elsewhere nonetheless "compete[s] with the radio stations located in the Metro." *Id.* ¶ 279. For purposes of the multiple ownership rules, the Commission considers a radio station to be located in its "home" Metro, as determined by Arbitron, as well as in the Metro where its community of license is located, if it is not within the same Metro. *See id.* ¶ 280 & nn.594, 595, 596; *id.* ¶ 286 n.609. For radio stations not located inside an Arbitron Metro, the Commission retained a modified version of the contour-overlap methodology. *See id.* ¶¶ 285–86.

The Commission also identified two possible problems with the Arbitron-based methodology that might arise in individual cases. First, although it concluded that Arbitron market definitions would serve the purposes of the ownership caps "in virtually all cases," the Commission acknowledged that there might be exceptions. *Id.* ¶ 497. In that event, "an interested party . . . has a statutory right to file a petition to deny a specific radio station application and present evidence that makes the necessary prima facie showing that the transaction is contrary to the public interest." *See id.* (citing 47 U.S.C. § 309(d)). Second, the boundaries of Arbitron Metros, as well as "home" market designations, were subject to change by Arbitron, often at the encouragement of regulated parties. *See id.* ¶ 278. To discourage manipulation, the Commission adopted a two-year waiting period before a radio station owner could take advantage of a change in market boundaries or "home" status. *See id.*

ADX Communications ("ADX") is licensee of two radio stations in the Pensacola, Florida, Arbitron Metro. In May and July 2012, one of its competitors, Cumulus Licensing LLC ("Cumulus"), filed applications to acquire licenses in the Pensacola Metro and the adjacent Mobile, Alabama, Metro.

Because Cumulus also proposed to transfer some of its licenses to other owners, the net result would be that Cumulus would gain one license overall. Cumulus had recently changed the community of license for another license — station WDLT-FM — from a city outside the Mobile Metro to a city within it. This had the effect of changing the market definition methodology to which all of Cumulus's licenses were subject. Before, they would have had to satisfy the contour-overlap methodology because one community of license was not within any Arbitron Metro. *See Ownership Order*, ¶ 286 n.609. After the change in community of license, Cumulus's radio stations only had to satisfy the Arbitron-based methodology.

ADX filed petitions to deny the proposed transfers on the ground that Cumulus's acquisition would not comply with the multiple ownership limits under the contour-overlap methodology, to which Cumulus's licenses would be subject without the change in community of license. Neither the Commission nor Cumulus (nor the other intervenors) has argued otherwise, and Cumulus's purchase agreement admitted as much, *see* Asset Purchase Agreement, ATI-2500130v12, at 1 (May 4, 2012). ADX argued that because the adjacent Pensacola and Mobile markets were both served by 14 radio stations in common, the Commission should deviate from the normal Arbitron market definitions and treat the region as one market. Under that approach, the assignment to Cumulus would have resulted in Cumulus owning six FM stations in the combined market, which exceeds the ownership caps in 47 C.F.R. § 73.3555(a), *supra* note 1. ADX also argued that the two-year waiting period described in the *Ownership Order* should apply to Cumulus's change in community of license. And if Cumulus thereby could not rely on the Arbitron market definitions, then its acquisition would have to be analyzed using the modified contour-overlap methodology, under which it would violate the ownership rules.

The Media Bureau denied ADX's petitions and granted the assignment applications. *See Dan J. Alpert, Esq.*, 28 FCC Rcd. 20 (Media Bureau 2013) ("*2013 Bureau Denial Letter*"). It determined that after the proposed assignments, Cumulus's station ownership would comply with the ownership rules using the Arbitron market definitions. It rejected ADX's argument to depart from the Arbitron definitions because it found "nothing new or unique about two adjacent Arbitron markets sharing numerous radio stations." *Id.* at 27. Nor did it find the proposed transaction to be contrary to the public interest because, even after the assignment, "both the Pensacola and [Mobile] markets will continue to be served by at least ten different station owners." *Id.* at 25. The Bureau also found that the "community of license relocation did not trigger the two-year safeguard established by the *Ownership Order*," because it did not "directly concern market definitions, the main focus of the two-year safeguard." *Id*. at 26.

ADX filed an application for review, and the Commission, by memorandum opinion and order, affirmed the Bureau's letter decision. *See In the Matter of 6 Johnson Road Licenses, Inc.*, 29 FCC Rcd. 6386 (2014) ("*2014 Denial Order*"). The Commission, observing that the Bureau had "fully addressed . . . these issues," concluded first, that deviation from the Arbitron market definition was not warranted because "there is nothing new or unique about two adjacent Arbitron Metro Markets 'sharing' numerous stations," the contour-overlap methodology was "precisely the approach that the Commission rejected when it adopted the Arbitron Metro standard in 2003," and "competition for listeners would be preserved in the Mobile and Pensacola markets" by the participation of at least ten owners in each market. *Id.* ¶ 4. Second, the Commission declined to apply the two-year waiting period because changes in community of license did not "implicate the Commission's underlying concern

regarding the malleability of Arbitron Metro market definitions," since the Mobile Metro had already been the "home" market for the license in question. *Id.* ¶ 5 (quotation marks omitted).

## II.

On appeal, ADX contends that the Commission's "robotic application of its 'bright-line, geography-based' multiple ownership rules and polices in this instance is irrational, capricious, and contrary to the public interest." Appellant's Br. 21. In ADX's view, the decision not to deviate from the Arbitron market definitions was "improper" because those definitions did not capture the actual state of competition in Mobile and Pensacola. *Id*. at 35. Maps of the principal community contours of Cumulus's stations show that their signals reach large portions of both Metros. As ADX points out, some of those stations are transmitted from the same tower even though they are classified as being located in different markets. As a result of the assignment, Cumulus would own six FM stations that reach both markets even though the regulations cap the number of same-service stations in even the largest markets at five. *See* 47 C.F.R. § 73.3555(a)(1)(i), *supra* note 1. ADX maintains that the Commission was obligated to take a "hard look" at the "level of market dominance on the part of Cumulus" and failed to do so. Appellant's Br. 21–22.

The court's review of the *2014 Denial Order* is limited to determining whether the Commission's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, the agency must have articulated a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). The court

must defer to the "Commission's interpretation of its own rules . . . unless it is plainly erroneous or inconsistent with the regulation." *Star Wireless, LLC v. FCC*, 522 F.3d 469, 473 (D.C. Cir. 2008) (quotation marks omitted). The court similarly defers to the Commission's "reasonable application of its own precedents." *Vernal Enter., Inc. v. FCC*, 355 F.3d 650, 658 (D.C. Cir. 2004).

The Commission gave three reasons for refusing to depart from the Arbitron approach. Its analysis, which incorporated that in the *2013 Bureau Denial Letter*, satisfied the Commission's burden to reasonably explain its decision. First, and most importantly, it explained, with regard to ADX's claim that Mobile and Pensacola markets should be viewed as one market, that "there is nothing new or unique about two adjacent Arbitron Metro markets 'sharing' numerous stations — i.e., each Metro receiving substantial signal coverage from stations that are 'home' to the neighboring Metro." *2014 Denial Order*, ¶ 4 (quoting *2013 Bureau Denial Letter* at 27). It noted a pair of similarly adjacent markets in the Orlando, Florida, region. *See id.* ¶ 4 n.6. The Bureau had also observed that "[m]any Arbitron Metro markets nationwide are adjacent to each other," with some "even embedded in another Metro market, yet [they] are still treated separately under the *Ownership Order*." *2013 Bureau Denial Letter* at 27. In its brief, the Commission attached a map of all Metros in the United States that shows there are dozens of adjacent pairs of Arbitron Metros across the country. *See* Appellee's Br. Ex. A.[2] Although the Commission acknowledged in adopting Arbitron market definitions that it would allow for exceptions where necessary in the public interest, *see Ownership Order*, ¶ 497, the exception urged by ADX would effectively reinstate the contour-overlap

---

[2] The map is available at http://www.arbitron.com/ downloads/arb_us_metro_map_12.pdf.

methodology in many parts of the country, contrary to the "bright-line, geography-based definition" adopted in 2003. *2013 Bureau Denial Letter* at 24. Given the problems associated with the contour-overlap methodology that were identified in the *Ownership Order*, *see id.* ¶¶ 253–60, the Commission reasonably rested its decision on the fact that the circumstances identified by ADX also existed in many other metropolitan regions. *See 2014 Denial Order*, ¶ 4.

ADX maintains that its situation is different from other adjacent Metros because in Pensacola and Mobile "one owner's stations serve the majority of both markets," and "the number of stations serving the majority of both markets exceed[s] the Commission's multiple ownership limits." Reply Br. 17–18. This confuses the market definition with the subsequent application of the ownership limits. The fact that an assignment would violate the ownership rules under one market definition but not the other does not dictate which market definition should apply. ADX emphasizes that Cumulus's six FM stations will reach the vast majority of listeners in both Metros, a situation that does not necessarily exist in every pair of adjacent Metros where an owner would exceed the caps under contour-overlap methodology. Still, every adjacent pair of Metros has the potential for the same situation to arise. This possibility appears unavoidable in the Commission's decision to switch to the Arbitron methodology, which the Commission concluded was nonetheless justified as a more realistic way to assess the actual state of competition. As the Commission has explained, the Arbitron market definitions use much more data than signal coverage. *See Ownership Order*, ¶ 279–80. It was therefore reasonable for the Commission to conclude that "there is nothing new or unique about two adjacent Arbitron Metro markets 'sharing' numerous stations," *2014 Denial Order*, ¶ 4 (quoting *2013 Bureau Denial Letter* at 27), and the Commission did not need to examine the distribution of stations in all of the

other adjacent Metros in the United States. ADX, in other words, had to show circumstances more unique than the fact that the ownership rules would have been violated under the prior methodology. *See Ownership Order*, ¶ 497.

Precedent on which ADX relies offers an example of a circumstance that *has* been deemed unique. In *Luis. A. Soto*, 22 FCC Rcd. 2549 (Media Bureau 2007), the Media Bureau agreed to make an exception to the Arbitron market definition for a radio station on the far western side of Puerto Rico. It did so only after identifying a "unique combination of facts presented in this particular case," including multiple centers of economic activity within the Metro, a very high number of stations and owners, and "a central mountain range which effectively blocks signals originating in the eastern portion of Puerto Rico from reaching the western portion of the island, and vice versa." *Id.* at 2551–52. The Bureau declined to rely on a factor that was present elsewhere: "While there are other Arbitron markets that comprise more than one [Metropolitan Statistical Area], Puerto Rico is the only such market that has the additional factors of geographic size, topography, and sheer numbers of radio stations and station owners." *Id.* at 2552. The Commission reasonably concluded here that ADX had identified nothing comparable in the Pensacola-Mobile area.

Second, the Commission explained that ADX's market definition proposal, based on transmitter locations and signal contours, is "precisely the approach that the Commission rejected when it adopted the Arbitron Metro standard in 2003." *2014 Denial Order*, ¶ 4 (citing *2013 Bureau Denial Letter* at 27). ADX points out that the Commission nonetheless provided for exceptions in the *Ownership Order*. We agree that this reason could not justify the Commission's decision standing on its own, because citing the baseline shift to the Arbitron definitions does not explain a decision to deny an individual

request to deviate from those definitions. But considered in conjunction with the Commission's first reason, we understand the Commission to be underscoring the fact that deviating from the Arbitron definitions here would mean deviating in every other pair of adjacent Metros as well, which would effectively reinstate the old market definition methodology. The Commission did not have to consider that option because the time for challenging the *Ownership Order* has passed, *see* 47 U.S.C. § 402(c), and ADX does not purport to do so in any event.

Third, rejecting ADX's assertion that the Media Bureau had "mechanically" applied the numerical ownership limits, the Commission noted the Bureau's "full public interest analysis" and its conclusion that "post-transaction, competition for listeners would be preserved in the Mobile and Pensacola markets," a conclusion with which the Commission agreed, as both Metros will still have at least ten owners. *See 2014 Denial Order*, ¶ 4 & n.8 (citing *2013 Bureau Denial Letter* at 25). This consideration, like the second, might not be a sufficient explanation standing on its own, because the multiple ownership rules are concerned with the proportion of stations owned by a single entity, not simply the number of owners. *See* 47 C.F.R. § 73.3555(a). But neither is this consideration irrelevant to the public interest analysis that the Commission must undertake when reviewing applications to transfer radio licenses. *See* 47 U.S.C. § 310(d). Given an increase in license concentration (as is occurring here), the Commission could reasonably conclude that the "diversification of mass media ownership," *Nat'l Citizens Comm. for Broad.*, 436 U.S. at 780, would be better served by holding constant, rather than reducing, the number of owners in the market. *See 2013 Bureau Denial Letter* at 25. In any event, this consideration, when added to the first, provides a sufficient explanation for the court to conclude that the Commission's decision was not arbitrary or capricious. The

Commission has articulated a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## III.

ADX also contends that it was arbitrary and capricious for the Commission to refuse to apply the two-year waiting period described in the *Ownership Order*, which would have barred Cumulus from immediately relying on the change in community of license to justify avoiding contour-overlap analysis. Because the change allowed Cumulus to alter the market definition methodology to which its licenses were subject, ADX maintains that the purpose behind the waiting period — preventing manipulation of the Arbitron market definitions — applied, and that failing to apply it was contrary to Commission precedent.

### A.

As a threshold matter, the Commission contends ADX lacks standing under Article III of the Constitution to assert this challenge. It does not question ADX's asserted injury — that ADX "will be subjected to a much higher level of competition" because of Cumulus's acquisition, Appellant's Br. 2–3 — but rather maintains that ADX cannot satisfy the redressability requirement. To have Article III standing, a party "must demonstrate that it is likely" that its injury "will be redressed by a favorable decision of the court." *Spectrum Five LLC v. FCC*, 758 F.3d 254, 260 (D.C. Cir. 2014) (quotation marks omitted). The Commission maintains that because the two-year period had passed by the time ADX filed its appeal, as the Commission approved the change in community of license on May 7, 2012, "any remand concerning this issue would not change the outcome of the administrative proceeding." Appellee's Br. 34.

14

The Commission misunderstands the nature of ADX's challenge. ADX asks the court to "reverse" the Commission's decision, Appellant's Br. 55, which means the "[u]nwinding of Cumulus' purchase," Reply Br. 24. If the court reversed the *2014 Denial Order*, then Cumulus would no longer have its new licenses, and the competitive injury of which ADX complains would be alleviated. The court cannot presume that reversing the *2014 Denial Order* "would not change the outcome of the administrative proceeding," Appellee's Br. 34, because the court cannot know how the Commission (or the parties) would react to the changed circumstances presented by the passage of time and the analysis in the court's opinion. However the Commission might respond, it is enough that ADX will obtain the exact relief it seeks should its challenge succeed on appeal, without any need to rely "on actions by a third party not before the court." *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 739 (D.C. Cir. 2008). When a party alleges that an agency's action was arbitrary and capricious for failure to comply with the agency's own procedures, the agency cannot defeat standing merely by asserting that it will come to the same conclusion once the procedures are satisfied on remand. *Cf. Idaho v. ICC*, 35 F.3d 585, 591 (D.C. Cir. 1994) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

**B.**

Turning to the merits, ADX must show that the Commission's interpretation of the *Ownership Order* is "plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter." *Talk America, Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) (quotation marks and alterations omitted). It has failed to do so. The *Ownership Order* itself identifies only two circumstances in which the two-year period would apply: "a change in Arbitron Metro boundaries," and the "inclusion of a

radio station as 'home' to a Metro." *Ownership Order*, ¶ 278. More generally, it describes the waiting period as applying to "a change in Arbitron Metro definitions." *Id.* The Media Bureau has since applied the waiting period to the elimination of an entire Metro by Arbitron. *See In re WCCL(FM), Central City, Penn., et al.,* ("*Forever Broadcasting*"), 23 FCC Rcd. 17978 (Media Bureau 2008). Neither the *Ownership Order* nor precedent applying it state that a change in community of license alone would trigger the waiting period.

ADX instead points to the broader purpose of the two-year waiting period: preventing manipulation of the multiple ownership rules. Although the Commission did identify the goal of preventing licensees from "circumventing the local radio ownership rule," it did so only in the context of licensees "attempting to manipulate *Arbitron* market definitions." *Ownership Order*, ¶ 278 (emphasis added). Its concern was "'the malleability of *Arbitron* Metro market definitions.'" *2014 Denial Order*, ¶ 5 (emphasis added) (quoting *2013 Bureau Denial Letter* at 26). As interpreted by the Commission, the waiting period applies to changes in market definition made by Arbitron, not to changes approved by the Commission. *See 2014 Denial Order*, ¶ 5; *2013 Bureau Denial Letter* at 26. Thus, the Commission maintains that because *it* approved Cumulus's change in community of license, and the Arbitron "home" designation did not change, the two-year waiting period did not apply. *See* Appellee's Br. 36. That interpretation is consistent with the explanation and examples in the *Ownership Order*. Although the Commission has not suggested that, in considering whether to approve community of license changes, it takes account of possible manipulation of the ownership rules, ADX points to nothing in the *Ownership Order* that contradicts the Commission's interpretation. The Media Bureau precedent on which ADX relies also involved changes made by Arbitron, not, as here, a change approved by the Commission. *See In re*

*WCCL(FM), Central City, Penn., et al.* ("*Forever Broadcasting*"), 23 FCC Rcd. 17978; *In re Citicasters Licenses, L.P.*, 22 FCC Rcd. 17788 (Media Bureau 2007). ADX therefore fails to show that the Commission's interpretation is "plainly erroneous or inconsistent with the regulation" or otherwise suspect, *Star Wireless*, 522 F.3d at 473; *see Talk America*, 131 S. Ct. at 2261.

Accordingly, we affirm the *2014 Denial Order* of the Commission.