# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 18, 2024          Decided June 27, 2025

No. 24-1004

RADIO COMMUNICATIONS CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

---

On Petition for Review of an Order of
the Federal Communications Commission

---

*Timothy E. Welch* argued the cause and filed the briefs for petitioner.

*Adam Sorensen*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Daniel E. Haar* and *Robert B. Nicholson*, Attorneys, U.S. Department of Justice, *Jacob M. Lewis*, Deputy General Counsel, Federal Communication Commission, and *Sarah E. Citrin*, Deputy Associate General Counsel. *Alice A. Wang*, Attorney, U.S. Department of Justice, entered an appearance.

Before: KATSAS and CHILDS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Radio Communications Corporation ("RCC"), a telecommunications and media company, petitions for review of a final order issued by the Federal Communications Commission ("FCC" or the "Commission") implementing the Low Power Protection Act ("LPPA"), Pub. L. No. 117-344, 136 Stat. 6193 (2023). The LPPA provides low power television ("LPTV") stations with an opportunity to apply for an upgrade to a Class A license if they meet certain criteria. *See* LPPA § 2. To be eligible, a LPTV station must "operate[] in a Designated Market Area with not more than 95,000 television households." *Id.* § 2(c)(2)(B)(iii). A Designated Market Area ("DMA") means either "(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or (B) a Designated Market Area . . . using a system that the Commission determines is equivalent to the system established by Nielsen Media Research." *Id.* § 2(a)(2). Pursuant to the LPPA, the FCC issued an Order which, *inter alia*, adopted the statute's "95,000 television households" limitation for a DMA and confirmed that the Commission would use Nielsen's Local TV Report – a collection of data on local television markets – to determine a station's DMA. *In the Matter of Implementation of the Low Power Protection Act*, 38 FCC Rcd. 12627 (2023) ("Order").

Petitioner RCC operates a LPTV station, W24EZ-D, in Connecticut. On January 10, 2024, RCC challenged the Order as unlawful. RCC's primary argument focuses on the LPPA's size limitation for Class A license eligibility, *i.e.*, the station must operate in a DMA with not more than 95,000 television

households. RCC argues that the size limitation applies to a station's "community of license," not its DMA. A station's "community of license" is the community that the station is licensed to serve under section 307(b) of the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, a separate but related statute. RCC's station, for example, is licensed to serve Allingtown, a neighborhood of West Haven, Connecticut, which has fewer than 15,000 television households. However, RCC's station is a part of the Hartford-New Haven DMA which has approximately one million television households. Thus, under RCC's reading of the LPPA, its station satisfies the LPPA's size requirement, whereas under the Order, it does not.

RCC also raises a host of other statutory and constitutional arguments. It maintains that the Order contravenes section 307(b) of the Communications Act which, RCC contends, mandates nationwide Class A licensing. RCC also claims that the Order is unconstitutional because it (1) impermissibly regulates local economic activity in violation of the Commerce Clause; (2) impermissibly delegates legislative authority to a private party, Nielsen; and (3) impermissibly restricts a Class A license applicant's programming content as part of its requirements for Class A eligibility in violation of the First Amendment. Lastly, RCC argues that the Order is unlawful because it does not extend "must carry rights" – the requirement that cable systems carry certain television stations – to Class A licensees.

We are unpersuaded by RCC's arguments. The FCC's Order adheres to the best reading of the statute: A LPTV station must operate in a DMA with not more than 95,000 television stations to be eligible for a Class A license. The agency properly defined DMA according to Nielsen's data, as expressly authorized by Congress. Nowhere in the statute does

Congress reference "community of license," nor are communities of license equivalent systems to DMAs such that they can be adopted for determining Class A eligibility. *See* LPPA § 2(a)(2). Rather, the two metrics serve distinct purposes – a "community of license" determines area of license and a DMA determines area of Class A eligibility. Thus, by the terms of the statute, and as implemented by the Order, RCC's station is not eligible for Class A status because it operates in a DMA – the Hartford-New Haven DMA – with more than 95,000 television households. This reading of the statute is consistent with section 307(b) of the Communications Act, and it runs afoul of neither the commerce clause nor the nondelegation doctrine.

Finally, because RCC is ineligible for a Class A license based on the DMA size requirement, we need not consider RCC's separate argument regarding the constitutionality of the FCC's local programming requirements, nor RCC's argument that the FCC improperly denied must carry rights to Class A licensees. A favorable holding on either issue would not render RCC's station eligible for a Class A license.

Accordingly, we deny RCC's petition for review.

## I. Background

### A. *Statutory Background*

The FCC is governed by the Communications Act of 1934. *See* 47 U.S.C. § 151 *et seq.* The Act endows the Commission with broad licensing and regulatory authority, and its purpose is to provide "a unified and comprehensive regulatory system for the [broadcasting] industry." *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 137 (1940). As relevant here, section 307(b) of the Act provides, in pertinent part:

> In considering applications for licenses . . . when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.

47 U.S.C. § 307(b).

As may be seen, this provision generally directs the FCC to distribute broadcast resources in a fair, efficient, and equitable manner. *See, e.g.*, *New Radio Corp. v. FCC*, 804 F.2d 756, 757 (D.C. Cir. 1986) ("[W]here two or more mutually exclusive applicants have specified different communities of license, the FCC must determine the relative need [of] each applicant's proposed service area."). As relevant here, this provision relies on a concept, "community of license," which refers to "the community that [a] station is licensed to serve" under the statute. *ADX Commc'ns of Pensacola v. FCC*, 794 F.3d 74, 77 (D.C. Cir. 2015).

In 1982, the FCC began licensing LPTV stations to expand service in unserved and underserved areas. *See* Order, 38 FCC Rcd. at 12628 ¶ 2. Whereas full power television stations provide service to viewers located in larger service areas, LPTV stations broadcast service at a low transmitter power output and provide television service to viewers in smaller geographic areas. Because they operate at reduced power levels, LPTV stations can be fit into areas where a higher power station cannot be accommodated. *See id.* at 12628 ¶ 3.

From its inception, low power television service has been restricted to secondary priority, meaning that LPTV stations

"may not cause interference to, and must accept interference from, full power television stations." *Id.* at 12628 ¶ 2. "As a result of their secondary status, LPTV stations can also be displaced by full power stations that seek to expand their service area, or by new full power stations seeking to enter the same area as an LPTV station." *Id.* at 12628 ¶ 2 n.5.

In the Community Broadcasters Protection Act of 1999, Congress directed the FCC to create a set of Class A television licenses, which protect LPTV stations from the interference of full power stations. *See* Pub. L. No. 106-113, § 5008, 113 Stat. 1501 (1990). To obtain a Class A license under the Community Broadcasters Protection Act, LPTV stations had to meet certain criteria and apply for a license within a set time frame. *See id.*

In January 2023, Congress enacted the LPPA, which like the Community Broadcasters Protection Act before it, provides LPTV stations with an opportunity to apply for Class A licenses if they meet certain eligibility criteria. *See* LPPA § 2(c)(2)(B). As relevant here, the LPPA authorizes the Commission to approve Class A license applications only from LPTV stations that, "as of the date of enactment of [the LPPA], operate[] in a Designated Market Area with not more than 95,000 television households." *Id.* § 2(c)(2)(B)(iii). The LPPA states that a "Designated Market Area" means either "(A) a Designated Market Area determined by Nielsen Media Research or any successor entity; or (B) a Designated Market Area under a system of dividing television broadcast station licensees into local markets using a system that the Commission determines is equivalent to the system established by Nielsen Media Research." *Id.* § 2(a)(2). Eligible LPTV stations must apply for a Class A license within a year of the date when the FCC's rule implementing the LPPA becomes effective. *Id.* § 2(c)(2)(A).

**B.** *Factual and Procedural History*

On December 12, 2023, the FCC issued the Order, which implements the LPPA by, *inter alia*, setting the specific criteria pursuant to which LPTV stations qualify for Class A licenses. As relevant here, the Order adopted the language of the 95,000-size limitation verbatim. Order, 38 FCC Rcd. at 12643-44 ¶¶ 33-34, 12647 ¶ 38. It also provides that the FCC will use Nielsen's Local TV Report – a collection of data on local television markets – to determine a station's DMA. *Id.* at 12644 ¶ 35. In choosing to use Nielsen's data to determine a LPTV station's DMA, the FCC reasoned in the Order that this approach was fully consistent with the LPPA which contemplates the use of Nielsen. *Id.* The FCC also reasoned that RCC's proposed alternative – the community of license system – was not "equivalent" to the system established by Nielsen, which defines larger geographic regions than community of license, and thus would contravene the statute's plain command to use Nielsen DMAs or an equivalent system. *Id.* at 12648-49 ¶ 40 (quoting LPPA § 2(a)(2)(B)). The Order also requires that Class A license applicants carry a certain amount of "locally produced programming" in the ninety days preceding the statute's effective date to be eligible for the Class A status upgrade. *See* Order, 38 FCC Rcd. at 12635 ¶¶ 18-19; LPPA § 2(c)(2)(B)(i)(I).

The choice between a DMA and a community of license for determining eligibility makes a difference for RCC's station, W24EZ-D. RCC's station is licensed to serve Allingtown, a neighborhood of West Haven, Connecticut, which has fewer than 15,000 television households. However, RCC's station is part of the Hartford-New Haven DMA which has approximately one million television households, far exceeding the 95,000-households statutory limit. Thus, under

the FCC's reading of the LPPA, RCC's station is ineligible for a Class A license.

RCC submitted comments during the FCC's rulemaking proceedings opposing parts of the FCC's proposed rule, which were ultimately adopted in the Order. For instance, RCC argued that determining Class A license eligibility based on Nielsen's data was "nonsensical" because 177 out of the 210 DMAs in Nielsen's Local TV Report had more than 95,000 television households; thus, most LPTV stations in the country would not qualify for Class A licenses. *See* Order, 38 FCC Rcd. at 12647 ¶ 38. In rejecting RCC's argument that using Nielsen's data unduly restricted the number of LPTV stations that would qualify for Class A licenses, the FCC stated in the Order that "Congress clearly intended that eligibility under the LPPA be limited, as the Act expressly provides that eligibility is limited to DMAs with no more than 95,000 TV households." *Id.* FCC maintains that its rule is consistent with Congress's instructions, as set out in the LPPA.

On January 10, 2024, RCC filed a timely petition for review of the Order. *See* 47 U.S.C. § 402(c).

## II. ANALYSIS

### A. *Standard of Review*

Under the Administrative Procedure Act ("APA"), we will hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining whether an agency's interpretation of its governing statute is contrary to law, we must exercise our "independent judgment" and "apply[] all relevant interpretive tools" to reach "the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 603

U.S. 369, 394, 400 (2024). Congress may "confer discretionary authority on agencies . . . subject to constitutional limits." *Id*. at 404. "[T]o stay out of discretionary policymaking left to the political branches, [reviewing courts] need only fulfill their obligations under the APA to independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id*.

## B. *Standing*

To establish Article III standing, a plaintiff must show (1) injury in fact that is concrete and particularized and actual or imminent rather than conjectural or hypothetical, (2) causation fairly traceable to the defendant's challenged action and (3) redressability by a favorable decision that is likely as opposed to merely speculative. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

RCC has Article III standing to challenge the Order's size limitation for Class A eligibility. RCC is the holder of a LPTV broadcast license which is "directly and adversely affected" by the Commission's eligibility rules as set out in the Order. *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (internal quotation marks and citation omitted). Specifically, FCC's interpretation and implementation of LPPA section 2(c)(2)(B)(iii) renders RCC ineligible to receive a Class A license upgrade. Such an upgrade comes with substantial economic benefits, including protection from the interference of full power stations. The Order's denial of these economic benefits to RCC by the terms of its rules can be remedied by a favorable ruling from this court regarding the legality of the Order.

## C. *Class A License Eligibility*

The LPPA's plain text is clear. It sets specific eligibility criteria for LPTV stations seeking Class A status: "The Commission may approve an application . . . if the low power TV station submitting the application . . . satisfies" the listed requirements, including that, at the time of enactment, it "operates in a Designated Market Area with not more than 95,000 television households." LPPA § 2(c)(2)(B). RCC's station operates in a Designated Market Area – the Hartford-New Haven DMA – with more than 95,000 TV households. Thus, by the clear terms of the statute, RCC's station is ineligible for a Class A license.

Yet, RCC argues that the statute's limitation of "95,000 television households" refers to a station's community of license, and not to the number of households in the station's DMA. In other words, RCC reads the operative text as requiring the eligible LPTV station (1) to "operate in a DMA" of any size and (2) to service a community of license "with not more than 95,000 television households." Unlike "Designated Market Area," however, "community of license" appears nowhere in the eligibility requirements or the LPPA. Instead, RCC seeks to import "community of license" from section 307(b) of the Communications Act. RCC's convoluted reading of these statutory provisions is plainly incorrect.

"As with all questions of statutory interpretation, we start with the text." *Pharm. Mfg. Rsch. Servs., Inc. v. FDA*, 957 F.3d 254, 260 (D.C. Cir. 2020). The phrase "95,000 television households" modifies the immediately preceding "Designated Market Area," not the phrase "community of license," which appears nowhere in the LPPA, nor the phrase "the low power TV station submitting the application," which appears much earlier in the statute. *See Lockhart v. United States*, 577 U.S.

347, 351 (2016) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." (citations omitted)).

RCC's alternative reading of the statute – pursuant to which "95,000 television households" modifies the community that the station is licensed to serve – would render the Designated Market Area language nearly superfluous. *See Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816 (D.C. Cir. 2008) (explaining that courts should "if possible, . . . construe a statute so as to give effect to every clause and word" (cleaned up)). Every television station located in the lower 48 states falls within one of Nielsen's DMAs. Thus, under RCC's reading of the LPPA, the statute's requirement that a station applying for a Class A license fall within a DMA would serve no purpose. The best reading of the statute, giving effect to every clause and word, is that Class A license eligibility is limited by the size of a station's DMA.

Moreover, we have no reason to believe that Congress intended for the FCC to adopt an alternative community of license metric, found in a different statute, when it specifically provided and defined, in the operative statute, the geographic metric to be used in determining Class A eligibility: "Designated Market Area determined by Nielsen Media Research" or some "equivalent." LPPA § 2(a)(2); *see also Rawat v. Comm'r*, 108 F.4th 891, 895 (D.C. Cir. 2024) ("Statutory definitions are virtually conclusive of statutory meaning." (internal quotation marks and citation omitted)). Where Congress did intend to rely on the Communications Act, such as by incorporating some of its requirements, Congress referenced that statute and specific, relevant provisions explicitly. *See* LPPA § 2(c)(2)(B)(i)-(ii). When discussing the size limitation, however, Congress made no mention of the Communications Act, referring only to "Designated Market

Area," which it had defined earlier, instead. *Id.* § 2(c)(2)(B)(iii).

Furthermore, although the LPPA does authorize the agency to adopt an alternative system, that system must be equivalent to the one defined by reference to Nielsen's data. *See id.* § 2(a)(2)(B). Section 307(b)'s "community of license" does not provide for an equivalent system, as RCC itself recognizes, and thus was not a viable option for the FCC to adopt. *See* Pet'r's Final Br. 13 (describing Nielsen's DMA as much "larger geographic regions" than section 307(b)'s community of license); *see also* Order, 38 FCC Rcd. at 12648-49 ¶ 40 (quoting LPPA § 2(a)(2)(B)).

Unable to account for the statute's plain text, RCC turns to the statute's purpose. RCC argues that the Commission's interpretation of the LPPA to restrict Class A licenses to only certain LPTV stations conflicts with the statute's general purpose, which RCC argues is to protect LPTV stations nationwide. RCC significantly overreads the LPPA's purpose. The LPPA does not provide unbounded protection for LPTV stations. Rather, its purpose is to provide LPTV stations "with a limited window of opportunity to apply for" Class A licenses. LPPA § 2(b). Moreover, by setting out specific eligibility criteria, Congress clearly did not intend for any and all LPTV stations to benefit from the statute – only those that meet the statutory requirements. In any event, even if RCC is correct that a larger purpose of the statute is to expand Class A licensing as broadly as possible across the nation, "the statute's larger purpose alone does not warrant departing from the [statute's] text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 334 (D.C. Cir. 2020).

Thus, with no support in the LPPA for its position, RCC turns to the separate but related Communications Act. RCC

reads section 307(b) of the Act as mandating nationwide Class A licensing. That provision, however, does not support RCC's reading. Section 307(b) generally "empowers the Commission to allow licenses so as to provide a fair distribution among communities." *FCC v. Allentown Broad. Corp.*, 349 U.S. 358, 362 (1955). It also directs the Commission to evaluate fair distribution of broadcast resources in certain circumstances – for example, "[w]hen multiple applicants seek mutually exclusive licenses to operate a noncommercial educational . . . radio station." *Mary V. Harris Found. v. FCC*, 776 F.3d 21, 22 (D.C. Cir. 2015). Section 307(b) does not specifically address LPTV stations, let alone guarantee Class A status to LPTV stations on a nationwide basis. Rather, in pursuing section 307(b)'s general aims, the Commission is bound by the express limitations set out in the LPPA: to restrict Class A eligibility by the size of a station's DMA, defined according to Nielsen's data. Nothing in the general language of section 307(b) requires the Commission to override this clear instruction from Congress.

RCC also argues that the Order "effectively reassigns . . . LPTV licenses . . . from their small Section 307(b) communities of license to much larger . . . DMAs." Pet'r's Final Br. 10. This argument is without merit. As the FCC explained, the use of DMAs to determine Class A eligibility is wholly unrelated to the concept of communities of license under section 307(b). *See* Order, 38 FCC Rcd. at 12649 ¶ 40 n.187 (rejecting RCC's reassignment argument because "[the Commission's] decision . . . relates only to implementation of the LPPA, and does not affect the communities LPTV stations are licensed to serve"). In other words, how the Commission defines a station's DMA for the purpose of Class A eligibility does not affect the station's area of licensing or otherwise alter its LPTV license. The two provisions and the two statutes are distinct.

RCC also challenges the FCC's interpretation of the LPPA as inadequately explained. This claim fails because the interpretation is legally compelled: The challenged provisions of the Order are a direct implementation of the statutory text. Moreover, the Commission explained, by reference to the statute, why it limited Class A eligibility to LPTV stations in DMAs with no more than 95,000 TV households. *See id.* at 12643-44 ¶¶ 33-34. The Commission also considered alternative systems for demarcating local markets and found that they raised a variety of issues or were not equivalent to Nielsen's DMAs and, thus, could not be used. *See id.* at 12644-49 ¶¶ 35-40. The Commission's explanation of its decision-making was thus more than adequate.

More generally, RCC suggests that the Commission failed to respond to all of its arguments raised in comments. We disagree. On the record before it, the Commission provided ample substantive reasons for rejecting the principal arguments that RCC raised. *See, e.g.*, *id.* at 12647-49 ¶¶ 38-40. Any "failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (internal quotation marks and citation omitted). No such concern exists in this case.

With respect to the constitutional issues raised by RCC, those matters have been raised with this court and are addressed in this opinion. *See Loper Bright*, 603 U.S. at 391 (emphasizing that it is the role of "the reviewing court" to "interpret constitutional . . . provisions"); *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 242 (1968) (Harlan, J., concurring in result) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies.").

Lastly, RCC raises a variety of concerns that ultimately amount to policy disagreements. For example, RCC complains that restricting eligibility based on DMAs would "deny Class A licenses covering more than 98% of the Nation's population." Pet'r's Final Br. 38-39. However, as the agency explained, "while 98 percent of television households may fall outside eligible Designated Market Areas, 33 out of 210 Designated Market Areas fall within the statute's 95,000 television household threshold." Br. for Resp'ts 25. The LPPA concerns LPTV stations that service small areas with low populations and, thus, by its terms excludes huge swaths of this nation's population from its scope. Congress also further limited upgrades under the LPPA to stations in *certain* areas within that universe of small geographic regions, further reducing the number of households affected. To the extent RCC is dissatisfied with this arrangement, its concerns are better levied at Congress, which set out the eligibility requirements, than at the Commission, which faithfully executed them.

## D. *Constitutional Challenges*

RCC argues that the FCC interpreted the LPPA in an unconstitutional manner as (1) regulating local economic activity beyond the scope of the interstate commerce clause and as (2) delegating legislative authority to a private, non-governmental entity, Nielsen. Accordingly, RCC asks this court to adopt its reading of the statute in order to avoid these alleged constitutional issues. We decline to do so because the agency's reading of the statute is entirely consistent with the statute, which raises no such constitutional concerns.

As discussed above, the plain language of the LPPA compels the agency's interpretation. RCC does not separately

challenge the LPPA itself as unconstitutional. However, because the statute and the agency's interpretation are effectively indistinguishable, RCC's constitutional challenges are ultimately about the statute and whether its regulatory scheme runs afoul of the commerce clause or nondelegation doctrine. We find that it does not.

First, in enacting the LPPA, Congress acted well within its power to regulate commerce. The Supreme Court "ha[s] long recognized that Congress, acting pursuant to the Commerce Clause, has power to regulate the use of" broadcast communications, including television broadcasting. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 376 (1984). A feature of broadcasting is that it crosses state lines, and in approving specific local stations for status upgrades, Congress is acting to regulate the interstate broadcast market more broadly, not just local activity. Moreover, Congress has the power to regulate local activity that, when aggregated with similar activities of others, has a substantial effect on interstate commerce. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012); *United States v. Sullivan*, 451 F.3d 884, 888 (D.C. Cir. 2006). The local activity at issue in this case belongs to an economic class of activities – television broadcasting – that has a substantial effect on interstate commerce, making it wholly within the scope of Congress's legislative power.

Second, RCC's argument that the "DMA market structure . . . is unconstitutional" because it "improperly delegates legislative authority to a private, non-governmental entity" is without merit. Pet'r's Final Br. 42. Neither Congress nor the FCC delegated legislative authority to Nielsen by defining the phrase "Designated Market Area" by reference to that private company's system of designating television markets. The LPPA and the Order merely refer to and incorporate Nielsen's data for the limited purpose of determining a Class A license

applicant's DMA at a single moment in time. Our case law suggests that agencies are free to rely on private entities to provide factual information. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 567 (D.C. Cir. 2004) ("[A] federal agency may use an outside entity, such as a . . . private contractor, to provide the agency with factual information."); *see also Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1265 (D.C. Cir. 2023) (recognizing that "agencies may incorporate privately developed standards into law by referencing them in agency rulemaking"). And the Commission has "long relied on Nielsen DMA data to define television markets," Order, 38 FCC Rcd. at 12644 ¶ 35, in part because Nielsen's market assignments "provide the most accurate method for determining the areas served by local stations," *In the Matter of Definition of Markets for Purposes of the Cable Television Mandatory Television Broadcast Signal Carriage Rules*, 11 FCC Rcd. 6201, 6220 ¶ 39 (1996). Doing so here at Congress's direction violated no constitutional principle.

To conclude, we find no daylight between the agency's Order and the text of the statute. Thus, by challenging the agency's interpretation of the statute as unconstitutional, RCC is effectively challenging the constitutionality of the statute. We find these challenges to be without merit.

## E.  *Final Considerations*

Because RCC is ineligible for a Class A license based on the DMA size requirement, we need not consider RCC's separate argument regarding the constitutionality of the FCC's local programming requirements, nor RCC's argument that the FCC improperly denied must carry rights to Class A licensees.

First, the local programming requirements present a separate and additional hurdle to a Class A license upgrade. RCC's station has already failed at the first hurdle – the DMA size requirement – and, thus, we have no need to rule on the next hurdle, particularly when it raises a constitutional question. *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657 (D.C. Cir. 1989) ("[I]t is an elementary canon that American courts are not to 'pass upon a constitutional question . . . if there is also present some other ground upon which the case may be disposed of.'" (alteration in original) (citation omitted)); *see also Saga Broad. Corp. v. FCC*, 38 F. App'x 8, 11 (D.C. Cir. 2002) ("[I]f the Maryland stations are ineligible for Class A status regardless [of] whether the challenged requirements are vacated, then a decision in [petitioner's] favor will not redress the harm of which he complains.").

Second, even if we were to require the FCC to extend must carry rights to Class A licensees, RCC's station would be ineligible to receive such rights because it is ineligible for a Class A license. RCC thus lacks standing to bring a challenge to the agency's position on must carry rights.

## III. CONCLUSION

For the foregoing reasons, we deny the petition for review.

*So ordered.*